**UNITED STATES of America, Appellee,**

v.

**Benjamin B. LIBERA and Francis R. Sablone, Jr., Defendants–Appellants.**

**Nos. 1641, 1642, Dockets 91–1741, 91–1750.**

United States Court of Appeals, Second Circuit.

Argued June 9, 1992.

Decided March 22, 1993.

John C. McBride, Boston, MS (Francis T. O'Brien, Jr., McBride, Wheeler & Widegren, Boston, MS, of counsel), for defendant-appellant Benjamin B. Libera.

James A. Wade, Hartford, CT (Linda L. Morkan, Robinson & Cole, of counsel), for defendant-appellant Francis R. Sablone, Jr.

Joseph C. Hutchison, Asst. U.S. Atty., New Haven, CT (Albert S. Dabrowski, U.S. Atty. for the District of CT, of counsel), for appellee.

Before CARDAMONE, WINTER and MAHONEY, Circuit Judges.

WINTER, Circuit Judge:

Benjamin B. Libera and Francis R. Sablone, Jr. appeal from their convictions by a jury before Judge Dorsey. Both were found guilty of conspiracy and of securities fraud for insider trading. Sablone's appeal raises the question whether, in an insider trading prosecution, the tipper must have known that his breach of a fiduciary obligation would lead to the tippee's trading on the misappropriated information. We answer in the negative. Both appellants challenge the sufficiency of the evidence regarding the breach of a fiduciary duty by the tipper and knowledge of that breach by the tippee. The evidence was sufficient. We therefore affirm.

## BACKGROUND

Libera and Sablone were indicted by a grand jury on one count each of conspiracy in violation of 18 U.S.C. § 371 (1988). Libera was also charged with fifty-six counts of securities fraud in violation of 15 U.S.C. § 78j(b) (1988), and fifty counts of mail fraud in violation of 18 U.S.C. § 1341 (1988). Additionally, Sablone was charged with fifty-nine counts of securities fraud and fifty counts of mail fraud. Both appellants were found guilty of one count of conspiracy in violation of 18 U.S.C. § 371, and of fifty-six and fifty-nine counts, respectively, of securities fraud in violation of 15 U.S.C. § 78j(b).

Viewed in the light most favorable to the government, the evidence at trial demonstrated the following. R.R. Donnelley & Sons Co. ("Donnelley") operated a printing plant in Old Saybrook, Connecticut, which printed *Business Week*, a weekly publication owned by McGraw–Hill, Inc. The printing of *Business Week* began late Wednesday evenings and continued into Thursday.

Both McGraw–Hill and Donnelley follow a policy of keeping the contents of the weekly issue of *Business Week* confidential until 5:00 p.m. on Thursday. This policy is explicitly based on the fact that the contents of the magazine may affect the price of particular stocks and, prior to release, are regarded as "inside" information by the Securities and Exchange Commission.[1] This policy had been in effect since at least 1981. In a letter dated April 17, 1987, the Distribution Manager for McGraw–Hill, Thomas Tully, communicated the confidentiality policy directly to Donnelley's Director of the Old Saybrook plant. Further, in a letter dated April 27, 1987, *Business Week* Editor-in-Chief Steven Shepard communicated it directly to John B. Schwer, President of Donnelley. The letter stated:

> In view of recent widespread concern about insider trading, I thought it would be useful to remind you of some longstanding policies and procedures that *Business Week* expects all of its printers and other suppliers to follow.
>
>     1. The official release date of *Business Week* is 5 p.m. (New York Time)

---

1. In a memorandum to the *Business Week* staff dated March 12, 1986, the Editor-in-Chief, Steven Shepard, stated:

   > For many years now, *Business Week* has had a policy that prohibits the distribution of early copies of the magazine on Thursday. The reason: because the magazine contains information that could affect the performance of stocks. The SEC considers such release to be inside information if it reaches anybody before it is released to the general public.
   >
   > ... Our policy is that the contents of the Magazine are off limits to anyone outside the *Business Week* staff until 5:00 pm EST on Thursday.

every Thursday. No public distribution of *Business Week* is permitted prior to that time, either by *Business Week* employees or any of its printers or other suppliers. Accordingly, please ensure that every person in your organization is instructed that they are not permitted to give anyone a pre-publication copy of *Business Week* before 5:00 p.m. (New York Time) on Thursday. Moreover, we would appreciate it if you would instruct all employees of your organization that they are not permitted to advise anyone about any information included in *Business Week* prior to 5:00 p.m. (New York Time) on Thursday.

Donnelley in turn informed its employees of the confidentiality policy. James Roddy, Human Resources Manager for the Old Saybrook plant, testified that new employees were advised at orientation of the need to maintain the confidentiality of customer materials. Employees also received a Donnelley handbook advising them of the confidentiality policy. The handbook forbade even the discussion of the contents of magazines, much less their removal. Employee manuals placed at several locations throughout the plant contained similar warnings. In addition, a poster was placed in the employee entrance hallway stating that all customer materials were to be treated with absolute confidence. Donnelley also posted the April 17, 1987 letter from Tully. Guards were posted at the employee entrance and exit areas.

Accordingly, it was common knowledge among Donnelley employees that company rules forbade the removal of magazines from the plant. Indeed, every Donnelley employee who covertly provided early copies of *Business Week* to appellants and who testified stated that they knew of the confidentiality policy.

The government's case was that appellants traded in stock based on information in copies of *Business Week* delivered in violation of the McGraw–Hill/Donnelley confidentiality policy. That case was heavily dependent on the testimony of William Dillon, who had entered into a plea agreement involving two counts of wire fraud. According to his testimony, Dillon's wife, Diana, brought home copies of *Business Week* on Friday mornings in early 1986 after her four-to-midnight shift at Donnelley. She told her husband that Donnelley forbade the employees from taking magazines out of the plant. Dillon began tracking the stocks of companies analyzed in Gene Marcial's "Inside Wall Street," a regular *Business Week* column. The column recommended investing in various companies based on Marcial's consultation with analysts and other sources. Dillon observed that the trading in favorably mentioned securities often began increasing in volume and price on the Wednesday before publication and continued through the next Monday.

Dillon's wife did not bring the copies of *Business Week* home until early Friday morning. This was well after the *Business Week* Thursday 5:00 p.m. release time but was perhaps nevertheless in violation of the Donnelley rule against removal of magazines. In any event, Dillon, recognizing the value of receiving a copy of *Business Week* even earlier, sought out another Donnelley employee, William Cobb. Cobb agreed to bring a copy of the magazine, or simply a copy of the "Inside Wall Street" column, to the Monkey Farm Cafe at 9:00 a.m. on Thursday mornings after his shift. Dillon did not pay Cobb. Soon thereafter, Cobb changed shifts and an unidentified employee of Donnelley delivered the magazine to Dillon on one or two occasions. Dillon then approached William Sady, another Donnelley employee, who agreed to bring the magazine out at the end of his midnight-to-eight Thursday morning shift. Sady delivered the magazine to Dillon over an approximately two-year period at an initial price of $20 per copy. Dillon, of course, was using the "Inside Wall Street" information to trade on securities that were the subject of the column.

In the summer of 1986, Dillon approached appellant Brad Libera and told him that early investment in securities named in the "Inside Wall Street" column was a profitable strategy. Dillon also testified that he informed Libera that Donnel-

ley employees were not supposed to remove copies of the magazine.

Libera then began to accompany Dillon to the magazine deliveries. On October 9, 1986, Libera invested in MCA based on *Business Week* information and thereafter traded regularly in securities mentioned in the "Inside Wall Street" column. He executed a total of sixty-four Thursday trades in such stocks, resulting in a net profit of approximately $95,000. Between October 1986 and February 1987, Libera generally made the morning pickups alone because Dillon had entered a training program for stock brokers with Merrill Lynch. During this time Libera increased the payments to Sady from $20 to $30.

Also in the summer of 1986, Libera met appellant Francis Sablone, an attorney. Sablone and Libera used the same stock broker, Ralph Presutti, at Advest, Inc. Sablone learned of Libera's early acquisition of *Business Week* and of his trading on information in the "Inside Wall Street" column. Sablone then also began trading regularly on Thursday mornings in *Business Week* securities, receiving the information either from Libera or Presutti. Sablone made fifty-seven trades at a profit of approximately $36,000. Dillon testified that in early 1987 he informed Sablone that the employees were not permitted to remove magazines from the plant and that Sady was being paid $30 per copy for the magazine.

In the spring of 1987, Sablone took his trading business to Nicholas Bokron of E.F. Hutton. He told Bokron that some of his trades were based on *Business Week*

information. In late September, Bokron was informed by his superiors that trading in securities based on an early acquisition of *Business Week* raised serious questions of illegal insider trading. Bokron knew that Sablone had recently placed such a trade. He contacted Sablone, advised him of his superior's concerns, and told him that he would not accept any more trades based on *Business Week* information. On five subsequent occasions Sablone traded in securities based on *Business Week* information with other brokerage houses.

## DISCUSSION

Appellants' convictions are based on the so-called misappropriation theory arising out of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).[2] Sitting *in banc*, we recently restated that theory: "[O]ne who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *United States v. Chestman*, 947 F.2d 551, 564 (2d Cir.1991) (*in banc*) (citation omitted), *cert. denied*, — U.S. ——, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *see also id.* at 576 ("[L]ower courts have added to the *Dirks* [*v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983),] breach of duty doctrine a misappropriation of information doctrine, which prohibits trading in securities based on material, nonpublic information acquired in violation of a duty to any owner of such information, whether or not the owner is the corporation whose shares are traded.") (Winter J., concurring and dissenting opinion). We have

---

**2.** Section 10(b) provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1988). Pursuant to this section, the SEC has promulgated 17 C.F.R. 240.-10b–5 (1992), which provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

. . . . .

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

found the requisite fiduciary duty in the employer/employee context. *See United States v. Carpenter*, 791 F.2d 1024, 1028 (2d Cir.1986), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Newman*, 664 F.2d 12, 17 (2d Cir.1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *SEC v. Materia*, 745 F.2d 197, 201 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). We have also noted that "the misappropriation theory does not require that the buyer or seller of securities be defrauded." *Chestman*, 947 F.2d at 566. Rather, "the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities." *Id.* This fraud has been analogized to embezzlement, *see Carpenter*, 791 F.2d at 1033 n. 11, and may simply be thought of as the misuse, by trading, of stolen information. *See Chestman*, 947 F.2d at 578 (Winter, J., concurring and dissenting opinion).

## A. The Tipper's Knowledge of the Tippee's Intent to Trade

■ Sablone first argues that an essential element of Section 10(b) liability is that tippers must specifically know that their breach of a fiduciary obligation in misappropriating information will lead to trading on the information. This element is not required by our prior cases,[3] and we decline to add it here.

In *Chestman*, we noted that the misappropriation theory requires the establish-

ment of two elements: (i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had breached the duty. *See Chestman*, 947 F.2d at 570. We believe these two elements, without more, are sufficient for tippee liability. *See Dirks*, 463 U.S. at 659, 103 S.Ct. at 3263–64. The tipper's knowledge that he or she was breaching a duty to the owner of confidential information suffices to establish the tipper's expectation that the breach will lead to some kind of a misuse of the information. This is so because it may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing. To allow a tippee to escape liability solely because the government cannot prove to a jury's satisfaction that the tipper knew exactly what misuse would result from the tipper's wrongdoing would not fulfill the purpose of the misappropriation theory, which is to protect property rights in information. *See Chestman*, 947 F.2d at 576–78 (Winter, J., concurring and dissenting opinion). Indeed, such a requirement would serve no purpose other than to create a loophole for such misuse.

## B. Sufficiency of Evidence

Appellants also argue that there was insufficient evidence: (i) that a fiduciary duty of confidentiality existed because the information was already public; (ii) that, even if the information was nonpublic, the Donnelley employees willfully breached a fiduciary duty owed to Donnelley; and (iii) that, even if the information was nonpublic and the tippers breached a fiduciary duty, ap-

---

**3.** Sablone bases his argument largely on language in *United States v. Reed*, 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds*, 773 F.2d 477 (2d Cir.1985). In *Reed*, the court considered defendant's motion pursuant to Rule 12(b) of the Fed.R.Crim.P. to dismiss his indictment on four counts, count one of which charged securities fraud. *Id.* at 688–89. The language relied upon by Sablone is not the holding of the district court but rather that court's restatement of Reed's argument in support of his motion to dismiss the indictment. The court stated that as Reed's "argument proceeds, an essential element of tippee liability under Rule 10b–5 is proof that the tipping insider disclosed the confidential information with the knowledge or expectation

that the tippee would trade on the information, and thus, with the intent to defraud the securities holders of the insider's company." *Id.* at 694. The court dismissed the argument noting that the indictment did not allege the existence of such a state of mind of the tipper, Reed's father, and that the government had formally acknowledged that it would not seek to establish such an intent because it was not necessary to their case under a misappropriation theory. *See id.* at 693–94 n. 15. The court thus held that, without this element, count one alleged sufficient facts that a jury could find that defendant committed securities fraud under 15 U.S.C. § 78j(b). *Id.* at 737.

pellants knew or were reckless in not knowing that they were trading on misappropriated nonpublic information.

We note the familiar principle that a defendant who challenges the sufficiency of the evidence underlying a conviction bears a "very heavy burden." *United States v. Rivalta,* 892 F.2d 223, 227 (2d Cir.1989). That burden is met only if, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime. *United States v. Tejada,* 956 F.2d 1256, 1265 (2d Cir.1992) (stating the converse). In finding these essential elements, the jury may base its verdict on inferences from circumstantial evidence. *See e.g., United States v. Padilla,* 961 F.2d 322, 324 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 138, 121 L.Ed.2d 91 (1992). Finally, "in reviewing a challenge to the sufficiency of evidence, 'we must credit every inference that could have been drawn in the government's favor.'" *Tejada,* 956 F.2d at 1265 (*quoting United States v. Labat,* 905 F.2d 18, 22 (2d Cir.1990)).

1. *There was sufficient evidence that the information was material and nonpublic*

■ It is, of course, axiomatic that trading on public information does not violate Section 10(b) and appellants argue that the *Business Week* information was public before they traded. They argue that the information was released by McGraw–Hill on Thursday prior to the 5:00 p.m. deadline. We disagree. First, we note that the earliest time of release to the press argued by appellants is noon, Thursday. However, many of their trades were before that hour. Second, their description of the timing of publication is wrong. The magazines were sent to McGraw–Hill's press manager at noon, packaged in the afternoon, and distributed by messenger in time for "the nightly news." There was a message on the press package prohibiting release of the information until after 5:00 p.m. The jury could thus easily conclude that there was no public announcement of the information before 5:00 p.m.

Appellants also argue that the information was public because the stocks mentioned in the "Inside Wall Street" column began increasing in volume and price on Wednesday. We agree that information may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it. The issue is not the number of people who possess it but whether their trading has caused the information to be fully impounded into the price of the particular stock. Once the information is fully impounded in price, such information can no longer be misused by trading because no further profit can be made. However, trading on stolen information that is not fully impounded in price is a misuse of such information whether or not others are also trading on it. Otherwise, only the first misuse of stolen information would be illegal even though subsequent trades involved indistinguishable misconduct. Because appellants concede that the increase in trading volume and price of the securities in question continued after the release of the magazine to the general public, the jury was correct in finding that the information was not fully impounded in the price at the time of appellants' trades and was not public for purposes of Section 10(b) prior to the magazine's release.

2. *There was sufficient evidence that the employees willfully breached a fiduciary duty to McGraw–Hill and Donnelley*

■ Appellants also assert an insufficiency claim as to whether the Donnelley employees who delivered the magazine to appellants willfully breached a fiduciary duty to McGraw–Hill and Donnelley. The claim is entirely baseless. As noted, McGraw–Hill had expressly informed Donnelley of its confidentiality policy. Donnelley had adopted this policy and conveyed it to its employees at orientation, in employee manuals, by posters next to exits, and through word of mouth.

James Roddy, Human Resources Manager for the Old Saybrook plant, stated that outsiders had attempted to acquire maga-

zines from the plant, had been rebuffed, and had been reported to McGraw–Hill. McGraw–Hill periodically tested its printers by attempting to acquire early copies of *Business Week.* Jack Dierdorff, the Managing Editor of *Business Week*, testified that when McGraw–Hill suspected a leak of the "Inside Wall Street" column in 1987, it investigated its security procedures. It directed Donnelley to review their security procedures, and as a result, the Old Saybrook plant enhanced those measures. Finally, the witness/employees who delivered early copies of *Business Week* to appellants testified that they were aware of the policy and concealed the magazine to get it out of the plant.

3. *There was sufficient evidence that appellants knew that the employees had breached a fiduciary duty to their employer*

### a. Libera

■ Libera argues that it was unreasonable as a matter of law to infer knowledge on his part that the contents of *Business Week* were confidential. A rational jury could find, however, that his knowledge of the confidentiality of *Business Week* and the consequential breach of the employees' fiduciary duty was a reasonable inference from the evidence.

Dillon testified that he explicitly told Libera that the employees were forbidden from taking magazines out of the plant. Moreover, Libera's conduct was compelling evidence of his consciousness of wrongdoing. He paid Sady amounts well in excess of the newsstand price for the magazine and originally concealed from his broker the manner in which he acquired the magazines. Revealingly, when Libera discussed the Securities and Exchange Commission investigation with his broker Presutti, he disclosed for the first time what was paid for the magazine, stating "I hope they don't find out that Dillon was paying $30 a copy." This evidence easily justified the jury's inferring that Libera knew that the

employees were breaching a fiduciary duty to McGraw–Hill.

### b. Sablone

Dillon testified that he met with Sablone and told him that the employees were not allowed to take the magazine out of the plant and that the employees were receiving payment upon delivery of the magazine. Sablone was warned by his broker Bokron about trading on *Business Week* information. Sablone ignored these warnings and, when Bokron refused his orders, he traded with other brokerage houses.[4]

Sablone argues that Dillon did not tell him that the employees were forbidden from taking the magazine out of the plant. He relies on the testimony of John Isleib, Libera's cousin, who testified that he was present at the meeting at which Dillon supposedly told Sablone of the prohibition and that no such discussion took place. Sablone testified in a deposition before the SEC, however, that he had met Dillon on two occasions. Moreover, the jury obviously believed Dillon and not Libera, and Sablone is driven to argue that Dillon's testimony is incredible as a matter of law. There is no basis for such a ruling.

### CONCLUSION

Appellants' arguments that a conspiracy to commit securities fraud did not exist is so meritless as not to warrant discussion. In addition, appellants' activities clearly involved a scheme that used the mails and instrumentalities of interstate commerce. *See Carpenter v. United States*, 484 U.S. 19, 28, 108 S.Ct. 316, 322, 98 L.Ed.2d 275 (1987).

For the reasons stated above, the convictions are affirmed.

---

**4.** Sablone testified that he consulted with his brokers about whether his activities were legal and claimed to have relied on their opinion that

his use of *Business Week* information was legal. However, his brokers denied any such conversation, and the jury was free to credit their denial.