**Lawrence P. DIXON, Petitioner–Appellant,**

v.

**Thomas J. MILLER, Acting Superintendent, Woodbourne Correctional Facility, Respondent–Appellee.**

**Docket No. 99–2432.**

United States Court of Appeals, Second Circuit.

Argued: April 6, 2000.

Decided: May 23, 2002.

**76**

Georgia J. Hinde, New York, NY, for Appellant.

Howard A. Getzler, District Attorney's Office, Kings County, Brooklyn, NY, for Appellee.

The Honorable Stefan R. Underhill, United States District Judge for the District of Con-

Before: VAN GRAAFEILAND, F.I. PARKER, Circuit Judges, and UNDERHILL, District Judge.*

Judge UNDERHILL dissents in a separate opinion.

F.I. PARKER, Circuit Judge.

Petitioner–Appellant Lawrence P. Dixon appeals from a Memorandum and Order of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*), issued July 14, 1999, denying his application for habeas corpus relief pursuant to 28 U.S.C. § 2254. On August 19, 1999, Judge Gershon granted Dixon a certificate of appealability on the issue of the sufficiency of the evidence.

Dixon challenges a June 23, 1982 judgment of the New York Supreme Court, Kings County, convicting him after a jury trial in absentia of Criminal Possession of a Controlled Substance in the First Degree (N.Y. Penal Law § 220.21[1] (1975)) and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02[4] (1974)). Dixon received concurrent sentences of fifteen years to life and one to three years, and was released on parole in July 1998 after having served the minimum fifteen years of his sentence.

Dixon's petition for habeas corpus relief was filed pro se on January 30, 1997. The district court denied Dixon's petition on July 14, 1999, and Dixon timely appealed.

On appeal, the issues are: (1) whether Dixon's insufficiency of the evidence claim is procedurally barred and (2) whether Dixon's conviction was supported by sufficient evidence. Although we hold that Dixon's insufficiency of the evidence claim is procedurally barred, we consider his argument in the context of his claim of

necticut, sitting by designation.

actual innocence. We conclude that Dixon's conviction was sufficiently supported by evidence concerning his prior experience as a drug dealer, the packaging of the drugs found in the car he was driving, and his link to that car, and we affirm.

## I. BACKGROUND

The facts of this case are set out in the district court opinion. *Dixon v. Miller*, 56 F.Supp.2d 289, 292–94 (E.D.N.Y.1999). We repeat only those that are necessary to resolve the issues that remain before us.

Lawrence Dixon owned a small grocery store and barbecue pit a few blocks away from a social club on Reid Avenue in Brooklyn. The New York Police Department targeted the Reid Avenue social club as part of a "buy operation" in November 1977. On November 30, 1977, Dixon allegedly sold four glassine envelopes of heroin to an individual who then sold the heroin to an undercover police officer. The police recorded the sale to the undercover officer on an audio tape,[1] but did not arrest Dixon at that time so that the identity of a confidential informant would be protected.

Dixon was arrested on December 8, 1977 after the police observed him driving a car in the vicinity of Sumner Avenue and Madison Street. The police followed Dixon for several blocks, until he parked the car in front of a small store. As Dixon stepped out of the car, the police arrested him for his involvement in the November 30, 1977 sale. Dixon's passenger, Michelle Johnson, was also arrested after the police

observed her hand moving across the front seat near a partially concealed gun. Following the arrests, the police took Dixon, Johnson, and the car to the 79th Precinct. At the Precinct, the police conducted a routine search of the car, and one of the officers discovered a brown paper bag underneath the driver's seat. The bag contained thirty-seven glassine envelopes of a white powder that turned out to be two and five-eighths ounces of heroin. Dixon was charged, *inter alia*, with Criminal Possession of a Controlled Substance in the First Degree (more than two ounces of heroin), *see* N.Y. Penal Law § 220.21[1] (1975), and Criminal Possession of a Weapon in the Third Degree, *see* N.Y. Penal Law § 265.02[4] (1974), in connection with the drugs and firearm found in the car.

Following the postponement of Dixon's trial on the charges arising out of the December 8, 1977 events and an unrelated investigation of the police officers who arrested him, Dixon agreed to plead guilty on March 17, 1982. Dixon did not appear for the plea allocution and eventually was tried in absentia. Dixon was convicted on April 8, 1982 on the drug and firearm possession charges in connection with the December 8, 1977 events, and judgment of conviction was entered June 23, 1982. Dixon was sentenced, also in absentia, to concurrent terms of fifteen years to life for the drug possession count and three and one-half to seven years for the weapon possession count.

---

1. The sale, which occurred inside the social club on Reid Avenue, was not picked up by the police monitoring equipment and not recorded. Although much of the tape was static, Dixon's lawyer played a long portion of it for the jury, revealing that the tape did pick up some voices intermittently. *See* Tr. 1470–73 (April 6, 1982). In particular, after the undercover officer exited the social club, the tape captured his reporting to his fellow offi-

cers what had just happened: "Yeah, the deal went down, Larry came in and [re-upped] while I was there. They went into the bathroom. I'll talk to you as soon as I get on the radio." Tr. 686 (March 30, 1982), Tr. 1036 (April 1, 1982). The tape also recorded the undercover's warning his fellow officers that occurrences inside the social club led him to believe they might have been spotted by a lookout. Tr. 1489 (April 6, 1982).

Dixon was eventually apprehended in April 1983 and entered a *Serrano* plea on July 6, 1983, in which he pleaded guilty to certain crimes without admitting to the underlying facts. *See People v. Serrano*, 15 N.Y.2d 304, 206 N.E.2d 330, 258 N.Y.S.2d 386 (1965). Dixon pleaded guilty to Criminal Possession of a Controlled Substance in the Third Degree (heroin), *see* N.Y. Penal Law § 220.16[1], in relation to the November 30, 1977 events and to Bail Jumping in the First Degree, *see* N.Y. Penal Law § 215.57, in relation to his March 1982 disappearance. At sentencing proceedings on December 22, 1983, the court sentenced Dixon to one to three years on the narcotics charge, one and one-half to three years on the bail jumping charge, and reduced Dixon's prior weapons possession sentence to a term of one to three years, all to run concurrently with the prior sentence of fifteen years to life for First Degree Criminal Possession.

As the district court correctly noted, petitioner exhausted the potential state remedies for each of his claims raised in his petition for habeas corpus relief. *Dixon*, 56 F.Supp.2d at 294. Dixon's application for habeas corpus relief pursuant to 28 U.S.C. § 2254 was filed pro se on January 30, 1997. In his petition, Dixon challenged the April 8, 1982 judgment of conviction of the New York Supreme Court. The district court appointed counsel and considered three claims, including the sufficiency of the evidence. The district court denied Dixon's petition on July 14, 1999 holding that (1) sufficient evidence supported Dixon's convictions for both possession of a controlled substance and possession of a weapon, (2) Dixon was not denied effective assistance of counsel, and (3) Dixon knowingly and voluntarily waived his right to be present at trial by failing to appear as required. Dixon timely appealed.

## II. DISCUSSION

The issues on appeal are (1) whether Dixon's insufficiency of the evidence claim is procedurally barred and (2) whether Dixon's conviction on the drug charge was supported by sufficient evidence. This Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291, 28 U.S.C. § 2253, and Fed. R.App. P. 4(a). Even though Dixon has been released on parole, he remains "in custody" for habeas proceedings. *Jones v. Cunningham*, 371 U.S. 236, 242–43, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *Maleng v. Cook*, 490 U.S. 488, 491, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).

We review de novo a district court's denial of a petition for a writ of habeas corpus. *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir.1999). The record in a habeas corpus proceeding is reviewed in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Dixon "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Einaugler v. Supreme Court of New York*, 109 F.3d 836, 839 (2d Cir.1997) (quoting *Jackson*, 443 U.S. at 324, 99 S.Ct. 2781).

### A. *Procedural Bar*

Dixon's habeas petition is founded on the decision of the New York Court of Appeals in *People v. Ryan*, 82 N.Y.2d 497, 626 N.E.2d 51, 605 N.Y.S.2d 235 (1993). In *Ryan*, the Court of Appeals interpreted the language of New York Penal Law § 220.18 (Criminal Possession of a Controlled Substance in the Second Degree) to include a *"mens rea* requirement associated with the weight of a controlled substance." 82 N.Y.2d at 504–05, 626 N.E.2d

at 55, 605 N.Y.S.2d at 239.[2] The court reversed the Appellate Division, which had required knowledge of possession but not knowledge of the weight of the controlled substance. Dixon, basing his petition claim on *Ryan,* contends that there was insufficient evidence to permit a jury to conclude that he knew the quantity of the drugs found in the car.

### 1. *The Retroactivity of Ryan*

The Government first argues that relief under *Ryan* is unavailable to Dixon because his appeal is on collateral review. As the Government points out, the New York Court of Appeals has held that *Ryan* is retroactive to cases that were pending on direct appeal at the time *Ryan* was decided on December 16, 1993, *People v. Hill,* 85 N.Y.2d 256, 262, 648 N.E.2d 455, 458, 624 N.Y.S.2d 79, 82 (1995), and Dixon's direct appeal was completed six years earlier, *see People v. Dixon,* 130 A.D.2d 680, 516 N.Y.S.2d 16 (2d Dep't), *leave denied,* 70 N.Y.2d 645, 512 N.E.2d 563, 518 N.Y.S.2d 1037 (1987).

■ The Government's argument fails, however, for the reasons given in *Fiore v. White,* 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001). In *Fiore,* the Supreme Court explained that where a state's highest court for the first time interprets a criminal statute to require proof of a particular element and that interpretation does not create new law but merely clarifies what the law was at the time of a defendant's conviction, there is "no issue of retroactivity." *Id.* at 228, 121 S.Ct. 712. The state court's interpretation of the proof required must be applied on collateral review to prevent a violation of the Due Process Clause of the Fourteenth Amendment, which guards against convicting a defendant without proof beyond a reasonable doubt on each element of his crime. *Id.* at 228–29, 121 S.Ct. 712 (citing *Jackson,* 443 U.S. at 316, 99 S.Ct. 2781; *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). The New York Court of Appeals has declared that its interpretation of the criminal possession statute in *Ryan* did not create new law. *See Hill,* 85 N.Y.2d at 262, 648 N.E.2d at 458, 624 N.Y.S.2d at 82 ("Since *Ryan* construed the words of a statute, it established no new legal principle."). Therefore, Dixon's case is governed on collateral review by *Ryan's* holding that one of the elements of the criminal possession statute under which he was convicted is knowledge of the weight of the drugs possessed.

### 2. *State Procedural Bar*

■ The Government also argues that there can be no federal habeas relief for Dixon because his continued custody rests on the independent and adequate state ground of state procedural default. *See Coleman v. Thompson,* 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The state court determined that because no specific objection was raised with respect to proof of Dixon's knowledge of the weight of the heroin, that issue was not preserved. *See Dixon,* 56 F.Supp.2d at 297.

Dixon acknowledges that in *People v. Gray,* 86 N.Y.2d 10, 18–19, 652 N.E.2d 919, 920–21, 629 N.Y.S.2d 173, 174–75 (1995), the New York Court of Appeals held that a "specific" objection is a procedural requirement for preserving a *Ryan*

---

**2.** The New York legislature later overruled *Ryan* by amending the law to eliminate knowledge of weight as an element of any drug offense. *See* N.Y. Penal Law § 15.20(4) (1997). The amendment applies only to offenses committed on or after its effective date, June 10, 1995. *See Almanzar v. Portuondo,* No. CV–97–1859 JG, 1999 WL 557517, at *9 (E.D.N.Y. July 29, 1999).

challenge. The court stated that for an argument concerning the sufficiency of the evidence to be preserved, it must be " 'specifically directed' at the alleged error which, here, is the failure of the People to show that the defendants had knowledge of the weight of the contraband." *Gray*, 86 N.Y.2d at 19, 652 N.E.2d at 921, 629 N.Y.S.2d at 175 (quoting *People v. Cona*, 49 N.Y.2d 26, 33 n. 2, 399 N.E.2d 1167, 1169 n. 2, 424 N.Y.S.2d 146, 148 n. 2 (1979)).

With regard to the preservation of Dixon's claim, the district court found that Dixon had "challenged the sufficiency of the prosecution's evidence and the application of the statutory presumption regarding possession, but never referred specifically to the evidence regarding knowledge of the weight of the drugs." *Dixon*, 56 F.Supp.2d at 297 n. 3. The district court concluded that Dixon, by failing to lodge a specific objection, was procedurally barred from raising his claim in federal habeas proceedings. *See id.* at 297 (citing *Nkemakolam v. Senkowski*, No. 96–CV–2088 (FB), 1998 WL 388700, at *2 (E.D.N.Y. July 7, 1998); *Mason v. Ross*, No. 95 CIV. 9451(JFK), 1996 WL 363108, at *4 (S.D.N.Y. July 1, 1996)). We agree. Under *Gray* and *Hill*, the defendant must specifically object to the alleged failure of the People to show that the defendant had knowledge of the weight of the drugs.

In his main brief, Dixon acknowledges that his claim was procedurally defaulted in state court under the rule identified in *Gray*, and he focuses his arguments on overcoming this bar by attempting to show that a fundamental miscarriage of justice would result if we refused to consider the merits of his claim. Appellant's Br. at 20, 22–23 (citing *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) and *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). In his Reply

Brief, Dixon for the first time attacks the adequacy of the state's procedural rule requiring a specific objection, asserting that *Gray* announced a new standard for objections that did not apply at the time his case was tried. *Cf. Johnson v. Mississippi*, 486 U.S. 578, 587–89, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (state procedural default is an adequate ground for a petitioner's continued custody only when the procedural bar is "consistently or regularly applied"). Since the *Gray* court relied on *Cona*, 49 N.Y.2d 26, 33 n. 2, 399 N.E.2d 1167, 1169 n. 2, 424 N.Y.S.2d 146, 148 n. 2 (1979), Dixon's belated argument appears unpersuasive. In any event, because Dixon mounts his challenge to the adequacy of the state procedural bar for the first time in his Reply Brief, we decline to consider his argument. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995) (citing *NLRB v. Star Color Plate Serv.*, 843 F.2d 1507, 1510 n. 3 (2d Cir. 1988)).

### 3. The "Fundamental Miscarriage of Justice" Exception

■■■ Dixon contends that even if his challenge to the sufficiency of the evidence was defaulted, this Court should consider and grant his petition under the exception to the procedural bar rule made for fundamental miscarriages of justice. In *Coleman*, the Supreme Court explained that

[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred *unless* the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, *or* demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

501 U.S. at 750 (emphasis added). In the event of a fundamental miscarriage of justice, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," the Court has recognized that "a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496, 106 S.Ct. 2639. "To establish actual innocence, petitioner must demonstrate that 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.' " *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (*quoting Schlup v. Delo*, 513 U.S. 298, 327–28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)) (further citation omitted). " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623–24, 118 S.Ct. 1604 (citation omitted); *see also Triestman v. United States*, 124 F.3d 361, 363 (2d Cir.1997) ("[S]erious constitutional questions would arise if a person who can prove his actual innocence on the existing record—and who could not have effectively raised his claim of innocence at an earlier time—had no access to judicial review.").

Dixon argues that, in spite of his procedural default, he merits habeas relief on the grounds that he is factually innocent of first degree possession of a controlled substance because there was insufficient evidence that he knew the weight of the drugs he possessed and, due to the earlier misunderstanding of the law, the element of knowledge of weight was never proved beyond a reasonable doubt at his trial in violation of the Constitutional requirements set out in *Jackson*, 443 U.S. at 316, 99 S.Ct. 2781 and *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068. The Government responds that the evidence at Dixon's trial was sufficient to prove that he knew the weight of the heroin and therefore he cannot make the threshold showing of "actual innocence" necessary to invoke the fundamental miscarriage of justice exception to the procedural bar. Since the question of Dixon's actual innocence depends on the evidence at trial and its sufficiency, we turn to that issue now.

### B. *Sufficiency of the Evidence*

As noted above, a challenge to the sufficiency of the evidence presents the question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. *Cf. Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). A defendant challenging the sufficiency of the evidence supporting his conviction bears a "heavy burden," *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir.1995) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir.1994)), because the government receives the benefit of having all permissible inferences drawn in its favor, *id.* (citing *United States v. Nersesian*, 824 F.2d 1294, 1302 (2d Cir.1987)). A jury's verdict "may be based entirely on circumstantial evidence," *id.* at 1043 (citing *United States v. Libera*, 989 F.2d 596, 601 (2d Cir.1993)), and the government's case need not refute every possible hypothesis supporting a defendant's innocence, *id.* (citing *United States v. Friedman*, 998 F.2d 53, 59 (2d Cir.1993)).

At the same time, "where a fact to be proved is also an element of the offense," and this fact is being established by permissible inferences, "[w]e must ... be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (citing *United States v. Soto*, 47 F.3d 546, 549 (2d Cir.1995) and *United States v.*

*D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).

 Dixon claims that he is factually innocent of first degree possession of a controlled substance because there was no evidence that he knew the weight of the drugs that he possessed. While the record reveals no direct evidence that Dixon knew the weight of the heroin that was found under the seat of the car that he was driving, the government responds that there was sufficient evidence to prove this element of the offense by inference.

As the district court observed, "New York courts have articulated certain circumstances from which the requisite knowledge concerning weight may be inferred." *Dixon*, 56 F.Supp.2d at 297.

In *People v. Garcia*, 86 N.Y.2d 27, 30, 652 N.E.2d 925, 927, 629 N.Y.S.2d 179, 181 (1995), a plastic bag holding 3¼ ounces and 3 grains of cocaine was recovered from the defendant's automobile during a stop for a traffic infraction. The New York Court of Appeals found that "possession alone is not enough to establish knowledge of weight because the amount possessed was so close to the statutory limit of two ounces, and no other circumstances indicated familiarity with drugs that might lead to knowledge of weight." *Id.* at 34, 652 N.E.2d at 929, 629 N.Y.S.2d at 183.[3]

With respect to the "other circumstances" not present in *Garcia*, New York courts have cited "evidence of the defendant's prior experience as a drug dealer" as sufficient to infer knowledge of weight.

*People v. Juwara*, 163 Misc.2d 311, 315, 620 N.Y.S.2d 909, 911 (N.Y.Sup.Ct.1994). The *Juwara* court explained:

> Involvement in the packaging or sale of the drugs ... would supply a reasonable basis for inferring knowledge of the weight of the drugs possessed. The value of drugs is so inextricably linked to purity and weight that anyone in the business of packaging or selling drugs must develop some familiarity with relative weights.

*Id.* at 316, 620 N.Y.S.2d at 912.

In addition, the New York Court of Appeals has asserted that "[w]hen drugs are packaged in vials, with roughly the same quantity in each vial throughout the drug-dealing industry, possession of a specific number of vials of cocaine would generally give rise to an inference defendant knew he possessed that particular quantity of drugs." *People v. Sanchez*, 86 N.Y.2d 27, 34, 652 N.E.2d 925, 929, 629 N.Y.S.2d 179, 183 (1995). For instance, in *People v. Hardy*, 226 A.D.2d 652, 653, 641 N.Y.S.2d 366, 368 (2d Dep't 1996), where the defendant was found to be "in possession of a quantity of small ziplock bags and an amount of drugs that could be packaged into 70 'doses' or saleable units," the court concluded that "the jury could have reasonably inferred that the defendant intended to sell the drugs and was sufficiently familiar with drugs so as to be able to determine their weight." *Id.*

The New York case law described above indicates that Dixon's knowledge of the drugs' weight could be inferred because

---

**3.** It is significant that the defendant in *Garcia* possessed drugs that were "uncut and unpackaged" for sale. *See Garcia*, 86 N.Y.2d at 35, 652 N.E.2d at 930, 629 N.Y.S.2d at 184. In dismissing charges against Garcia, the New York Court of Appeals cautioned, "we do not conclude here that possession of 3¼ ounces of cocaine, as a matter of law, cannot be a legally sufficient amount of contraband to support a sale charge. Our position is that, on these facts, there is no indication that defendant had knowledge of the weight of the drugs. None of the commonly known indicia of weight, such as *telltale packaging*, knowledge of value, or a voluminous appearance of the drugs was present here." *Id.* (emphasis added).

there was evidence of Dixon's prior role as a drug dealer and of his link to the packaged drugs found under the seat of the car he was driving.

### 1. Evidence of Dixon's prior experience as a drug dealer

The evidence presented to the jury concerning Dixon's involvement in the November 30 buy operation was sufficient to support a finding beyond a reasonable doubt that Dixon had sold drugs to Jones, who then sold them to Undercover Officer Crawford ("Undercover Crawford"). The jury, therefore, had evidence before it showing that Dixon was an experienced drug dealer and from which it could infer that Dixon knew the weight of the drugs found in the car on December 8, 1977.

At trial, Officer McGeown testified that John Jones and Larry Dixon were involved with the drug sale that occurred at the Reid Avenue social club on November 30, 1977. In addition, McGeown testified that the police stopped Dixon on December 8 because he "made a sale of narcotics on November 30th." McGeown also testified that Undercover Crawford had informed McGeown that he had made a buy from John Doe John, Little John, and John Doe Larry at the social club on November 30. Other evidence concerning the drug sale included Undercover Crawford's Buy Report covering the events of November 30, see Tr. 732 (March 30, 1982) (entering the Buy Report into evidence), and the tape recording of the transmissions from the undercover officer to the backup team, see, e.g., Tr. 1037 (April 1, 1982), 1470–73 (April 6, 1982) (tape played for jury). Finally, when reviewing the narcotics envelope recovered during the drug sale at the social club on November 30, Officer McGeown testified that the drugs in the envelope came from the buy in which Dixon was involved.[4]

The evidence relating to the November 30 buy operation, although seemingly irrelevant to the charges against Dixon for possessing heroin on December 8, was presented as part of Dixon's defense strategy to attack the credibility of the police who stopped his car on December 8. Dixon's defense focused intently on the November 30 incident because there happened to be a tape recording of some of what happened that day. Dixon sought to convince the jury that Undercover Crawford's account of the November 30 sale in his Buy Report and in his affidavit for a search warrant based on that sale, as well as the accounts of the November 30 sale presented in the testimony of the various police officers who appeared as witnesses during the trial, were contradicted by a few statements captured on the tape recording. Dixon contended this evidence showed the entire police operation against him was a frame and supported his explanation that the drugs found in his car on December 8 had been planted there by corrupt police. See, e.g., Tr. 1536 (April 7, 1982) ("It is a darn

---

4. McGeown testified that the lab request attached to the narcotics envelope listed the defendants as "JD Little John, buy operation 605, 1C and 3A." Tr. 718 (March 30, 1982). McGeown then explained the coding used on the lab request: "[A] number indicates the first subject in the buy operation who makes a sale of narcotics to us. In this instance it was John Jones. The letter refers to the sale being the first time he had sold narcotics to us in this particular buy operation. As each subject would be purchases [sic], they would be identified by a number 1, 2 or 3. In this instance, number 3 was Larry Dixon. The letters 1C referred to John Jones as having made the third sale of narcotics, drawing [sic] this operation to us and 3A refers to Larry Dixon being the third subject in the operation and ... participating in the first buy or purchase of narcotics from him." Tr. 90 (March 31, 1982).

lie from the beginning, from November 30.").

The Government summarized this evidence pertaining to November 30 in its closing argument and contended that, in fact, the evidence supported the prosecution's theory that Dixon was a heroin dealer. The Government argued:

> I thought we were trying a case of December 8th, 1977, but in turn we wound up trying a case involving Dixon on November 30th, 1977, also.
>
> I don't have to prove beyond a reasonable doubt that Dixon committed a sale on November 30, 1977, and you don't have to reach a verdict as to that. But I submit to you that thanks to all the evidence [Dixon's attorney] Mr. Beldock helped bring out and all these things in evidence, I have proven to you beyond a reasonable doubt that Dixon did participate in a sale of heroin in November 30, 1977, and the evidence shows that Dixon is a supplier, a seller and a transporter of heroin.
>
> Tr. 1583 (April 7, 1982).

Concerning Dixon's argument that the tape supported his theory of a police frame-up, the Government continued:

> Well, if any[thing], this tape proves beyond almost any doubt as to what I said about Dixon at the beginning of my summation, that the evidence shows that he's a supplier and a seller of heroin. How do I know that from the tape? You must realize, of course, that this tape is made after the fact .... By after the fact, I mean it is not a conversation between the undercover police officer and John Jones or Littlejohn or Dixon, it is a conversation where [Undercover Crawford] is already out, completed the sale and he is radioing the team. But you can take it as truth because if we believe Mr. Beldock and this is some sort of frame, then he would have been talking about something else on the tape, like Larry came in and nothing happened. Now if that was on the tape you might have a point that maybe something was up here. But there is nothing like that on the tape. What does it say ....
>
> "The deal went down." It means it happened.
>
> "Larry came in and re-up[p]ed while I was there. They went into the bathroom." Now if you listen to Mr. Beldock, he would have us believe that if this was so, it means that Larry went in and got maybe some drugs for himself and that's what the re-up means. If you believe that. But that's not what it means. It means that Larry came in and supplied Jones with heroin so that Jones could sell the heroin to the undercover police officer. That's what re-up means. He has it in his buy report later on.
>
> Tr. 1589–90 (April 7, 1982).

The Government noted that Undercover Crawford wrote in the Buy Report that while he was in the social club, someone came in and told Jones that police had been spotted outside.

> Now [Undercover Crawford is] there with Jones and he tells us that he was talking to Jones .... He says, "undersigned and J.D., meaning Jones, continuing to talk and J.D. asked if I had known Larry. Undersigned said that he might know Larry so I started to describe Larry and that's when an older man came into the location and went up to Littlejohn and the old man told him something which he said he couldn't hear and then Littlejohn came back to the undersigned and said that his man would be down in a minute because he believed that the man was around."
>
> Tr. 1591 (April 7, 1982).

Thus, the Government argued that Undercover Crawford's Buy Report was not contradicted by the tape, but in fact confirmed by it. The tape captured Undercover Crawford radioing the backup team as soon as he left the social club that he believed they'd been seen. The Government continued:

> Now, ... he said on the tape, "Hey, they think you might be out there because they sent a guy down to tell John to wait and as soon as you all clear out or something he was going to make a run down here." He has that in his report. This wasn't something he thought up on the tape and then didn't include in his report, it's right here.

Tr. 1591 (April 7, 1982).

The Government recounted for the jury what, according to Undercover Crawford's Buy Report, happened in the social club after the man reported to Jones that the police might be outside.

> So he waited, he said we continued to talk and a few minutes later after the man, or whoever was looking out probably figured they had cleared out Larry comes down....
>
> Larry comes in, goes into the bathroom with Littlejohn and Littlejohn had told the undercover before that he didn't have any stuff on him. They come out of the bathroom, Larry leaves and Littlejohn sells the heroin to the undercover police officer for $200.
>
> So Larry is acting in concert with Littlejohn in making a sale. Now, if this was supposed to be the frame to get Larry Dixon ..., why is this the sale case[?] Why isn't it Larry came, Littlejohn introduced me to Larry, I asked Larry if he had any stuff, Larry said he did. Larry took out the heroin, I gave him $200 and Larry gave me the heroin, case closed.

> Why is [it] Larry comes in, goes into the bathroom with Littlejohn, comes out and then Littlejohn [h]as the stuff[?] Does the undercover say anything about seeing Larry with anything?
>
> Now, you can infer, anyone I think that has any common sense can pick up on what really happened here. But why make the case like that? Why not open and shut[?] Make it open and shut that I talked to Larry, Larry did it? Why? Because that is the way it really happened.

Tr. 1591–94 (April 7, 1982).

The Government further argued that the evidence that Dixon carried a driver's license listing an alias, drove a car registered in someone else's name, and refused to make the sale directly to Undercover Crawford on November 30 supported a conclusion that Dixon was a professional drug dealer. The Government stated:

> Now, you can also infer that the evidence might show he is a heroin seller and a supplier. The evidence doesn't show that Dixon is stupid. He is a slick, cunning fellow as you can see by the fact of the car he drives is a different registration, a different license, and in fact, even about the sale on November 30 when he came in, he was going to supply Littlejohn with the narcotics so Little John could sell it to the undercover; but he wasn't going to talk or sell it himself to the undercover because he was too slick and too above, and by above Littlejohn he is Littlejohn's—one of Littlejohn's suppliers. He wasn't going to talk or sell any narcotics to Crawford because he didn't know Crawford. He knew Littlejohn. That's why they went in the bathroom, so Crawford couldn't see anything.

Tr. 1614 (April 7, 1982).

Due to Dixon's defense strategy of trying to show that he was framed by the

police beginning with the November 30 sale, evidence was presented to the jury from which it could conclude that Dixon was Jones's heroin supplier on November 30, 1977. This evidence showed that Dixon had prior experience as a drug dealer and provides a sufficient basis for a rational trier of fact to infer that Dixon knew the weight of the heroin he had hidden under his car seat on December 8, 1977. *See People v. Garcia*, 86 N.Y.2d 27, 30, 652 N.E.2d 925, 927, 629 N.Y.S.2d 179, 181 (1995); *People v. Hardy*, 226 A.D.2d 652, 653, 641 N.Y.S.2d 366, 368 (2d Dep't 1996); *People v. Juwara*, 163 Misc.2d 311, 315, 620 N.Y.S.2d 909, 911 (N.Y.Sup.Ct.1994).

## 2. *Evidence linking Dixon to the packaged drugs in the car*

As noted above, the New York Court of Appeals suggested in *Sanchez* that when the drugs possessed by a defendant are packaged for individual sale, "possession of a specific number [of packages] would generally give rise to an inference defendant knew he possessed that particular quantity of drugs." 86 N.Y.2d at 34, 652 N.E.2d at 929, 629 N.Y.S.2d at 183; *see also Cruz v. Greiner*, No. 98 CIV. 7939(AJP), 1999 WL 1043961, at *29 (S.D.N.Y. Nov.17, 1999) (although the amount of drugs possessed exceeded the statutory requirement by a narrow margin, the fact that "the drugs were packaged in separate vials, allow[ed] the jury to infer that [defendant] knew the total weight of the drugs based on the number of vials in his possession"); *People v. Barry*, 226 A.D.2d 266, 267–68, 641 N.Y.S.2d 280, 282 (1st Dep't 1996) (sole evidence of defendant's knowledge that drugs weighed ¼ ounce plus 14 grains was fact that drugs were packaged in "numerous vials ... which were uniform in appearance and prepared in such a way as to facilitate marketing in a drug-prone neighborhood"); *People v. Diaz*, 228 A.D.2d 368, 369, 645 N.Y.S.2d 11, 11–12 (1st Dep't

1996) (where defendant possessed 1¼ ounces of cocaine, "the fact that the drugs were packaged in two separate bags ... as well as his possession of a substantial quantity of 'telltale' commercial drug packaging materials such as vials and colored caps, was sufficient to support the inference that defendant had knowledge of the weight of the controlled substance in his possession and that it was in excess of the statutory threshold of one half ounce"), *appeal denied* 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996) (TABLE); *Hardy*, 226 A.D.2d at 653, 641 N.Y.S.2d at 368 ("[I]nasmuch as the defendant was also found in possession of a quantity of small ziplock bags and an amount of drugs that could be packaged into 70 'doses' or saleable units, the jury could have reasonably inferred that the defendant intended to sell the drugs and was sufficiently familiar with drugs so as to be able to determine their weight.") *appeal denied* 88 N.Y.2d 936, 670 N.E.2d 454, 647 N.Y.S.2d 170 (1996) (TABLE); *cf. People v. Martinez*, 228 A.D.2d 185, 186, 643 N.Y.S.2d 551, 552 (1st Dep't 1996) (evidence that defendant possessed a bag of crack cocaine weighing 2⅛ ounces and 21 grains was insufficient by itself to establish that he was aware that he possessed at least two or more ounces of the drug where the crack cocaine was "uncut, not packaged for sale and unaccompanied by any other saleslike conduct"); *People v. Diaz*, 227 A.D.2d 167, 168, 641 N.Y.S.2d 672, 672–73 (1st Dep't 1996) ("The mere fact that a package of heroin weighing 4½ ounces, 8 grains was found under a seat in a cab in which defendant and a cohort were passengers, *without more*, failed to establish that he had knowledge that he possessed at least the four ounces." (emphasis added)).

The heroin found under the seat of the car that Dixon was driving on December 8, 1977 was packaged into thirty-seven glas-

sine envelopes, thus indicating that it was ready for sale. Officer McGeown testified that "[a] glassine envelope [is] a see-through celephane [sic] envelope which has traditionally been used in the packaging of heroin." Tr. 88 (March 31, 1982). Since under New York case law one found possessing drugs that are packaged for sale is deemed to know the weight of those drugs, it is permissible to infer that Dixon knew the weight of the heroin if Dixon "possessed" the heroin found under the seat of the car.

There was testimony focusing on Dixon's relationship to the car that he was driving on December 8, 1977, which was sufficient to support a jury's inference beyond a reasonable doubt that Dixon possessed the heroin found in that car.

New York Penal Law § 220.25(1) (1973) contains a permissive presumption that all passengers in an automobile have knowing possession of a controlled substance found in that automobile. Thus, a conclusion by the factfinder that Dixon knowingly possessed the drugs found under the seat of the car would be proper as long as the prosecution showed that both Dixon and the drugs were present in the car. The testimony at trial establishes that Dixon was pulled over and arrested on December 8, 1977 for his involvement in a November 30, 1977 drug sale. Following the arrest of Dixon and his passenger, the car was impounded and searched by the police. As a result of this search, a brown paper bag containing thirty-seven glassine envelopes of heroin was recovered. Based on this evidence, a conclusion that Dixon knowingly possessed the heroin was proper. As discussed above, once Dixon was found to have possessed the heroin, an inference

that he had knowledge of its weight would also be proper because the heroin was packaged in saleable units.

Even if we ignore the presumption in New York Penal Law § 220.25(1) (1973), there is ample evidence to link Dixon to the heroin because the testimony at trial indicates that Dixon had an owner-like relationship with the car he was driving on December 8, 1977.[5] The testimony of the police officers establishes that Dixon drove the car on several occasions and was responsible for its retrieval from police custody. Although the car was not registered in Dixon's name, Officer McGeown testified that he had seen Dixon driving the same car on two occasions prior to his arrest. Other witnesses also testified that they had seen Dixon driving the car on other occasions. For example, Julius Petty and Mickey Mayo, two of Dixon's witnesses who knew Dixon from the neighborhood, both stated that they'd seen Dixon driving the car before December 8. See Tr. 1377–78 (April 5, 1982), Tr. 1401 (April 5, 1982). Michelle Johnson, who was Dixon's co-defendant, testified she believed the car belonged to Dixon. Tr. 1412 (April 6, 1982) ("Q: And to your knowledge, whose car was that? A: His car he was driving, I believe."). McGeown also testified that he observed Dixon driving the same car after the arrest date. This testimony establishes Dixon's link to the car, regardless of Dixon's legal rights to it.

Furthermore, Officer Myron, who was responsible for "vouchering" the car while it was in police custody, testified that Dixon was authorized by the registered owner of the car to pick it up. Tr. at 1219, 1241–42 (April 1, 1982). Police records and the testimony of Officer McGeown and Officer

---

**5.** We note that the jury did not rely on the presumption to convict Dixon's co-defendant Michelle Johnson, who was also riding in the car when it was pulled over by the police.

The jury found Johnson not guilty of possessing the heroin found under the car seat or the gun sitting on the seat.

Nekiunas establish that Dixon did pick up the car when it was released from police custody. Dixon's repossession of the car indicates that Dixon was responsible for the car, whether or not he was the legal owner. In light of evidence that Dixon drove the car before his arrest, picked the car up upon its release, and drove it after it was released, it was not incorrect to find that Dixon possessed the drugs in the car on December 8, 1977.[6]

Whether we rely on the presumption contained in New York Penal Law § 220.25(1) (1973) or the additional evidence of Dixon's link to the car, there is ample evidence for a jury to find beyond a reasonable doubt that Dixon possessed the drugs found in the car. If it is permissible for a jury to make such a conclusion about Dixon's possession of the drugs, New York law makes it possible for the jury to find beyond a reasonable doubt that he knew the weight of the drugs in the car. *See Sanchez,* 86 N.Y.2d at 34, 652 N.E.2d at 929, 629 N.Y.S.2d at 183; *Hardy,* 226 A.D.2d at 653, 641 N.Y.S.2d at 368.

### III. CONCLUSION

For the foregoing reasons we hold that Dixon's sufficiency of the evidence challenge, which relies on his claim that he is factually innocent of first degree posses-

sion of a controlled substance, fails and the denial of his petition for habeas corpus relief is affirmed.

UNDERHILL, District Judge, dissenting:

I agree with the majority's determination of all issues except the question of sufficiency of the evidence against Dixon. In my view, there was insufficient evidence in the trial record to permit a rational juror to find beyond a reasonable doubt that Dixon knew the weight of the drugs found in the car he was operating. Accordingly, under the principles set forth in *People v. Ryan,* 82 N.Y.2d 497, 626 N.E.2d 51, 605 N.Y.S.2d 235 (1993), and its progeny, the State failed to prove an essential element of the offense. I therefore believe that the petition should be granted,[1] and must respectfully dissent.

*An Inference of Knowledge of the Weight Must Be Reasonable*

There is no doubt that a rational juror could find that Dixon possessed the drugs found in the car he was operating. The critical issue to be decided is whether there was sufficient proof that Dixon knew the weight of those drugs. The majority seeks to show that, under New York law, Dixon's knowledge of the weight of the drugs can be inferred from "Dixon's prior

---

**6.** The testimony of Officer McGeown that the car was not registered in Dixon's name is the only evidence that undercuts his link to it. However, the strength of this testimony is reduced because of Dixon's apparent willingness to present the police with false documents. When he was pulled over on December 8, 1977, Dixon provided the police with a license bearing the name "Lawrence Billings." Tr. 573 (March 29, 1982). In addition, McGeown testified he saw Dixon after the arrest, driving a different car than the one in which he was arrested, but with identical license plates. The fact that Dixon used misleading documents and, apparently, switched number plates provides additional support for

the jury's conclusion that Dixon was tied to the car.

**1.** If Dixon was convicted on legally insufficient evidence, then his petition raises a federal constitutional violation warranting relief under 28 U.S.C. § 2254. "States are free to define the elements of, and defenses to, crimes. Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws." *Davis v. Strack,* 270 F.3d 111, 123 (2d Cir.2001) (citations omitted).

role as a drug dealer," and from "his link to the packaged drugs found under the seat of the car he was driving." Maj. Op. at 83. In my view, these bases are not sufficient.

Regarding Dixon's prior experience as a drug dealer, the majority relies upon: (1) evidence that police officers *suspected* Dixon was involved in a single, unwitnessed drug transaction; and (2) inferences that could reasonably be drawn from the prosecutor's *closing argument*. Such reliance is, in my view, impermissible. Simply put: (1) suspicions are not proof; and (2) a "summation is not evidence." *United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir.1994); *see generally* 4 L. Sand, et al., *Modern Federal Jury Instructions* at 74–3 (2000) ("Arguments by lawyers are not evidence, because the lawyers are not witnesses.").

Moreover, not all evidence of "prior experience as a drug dealer" would permit a reasonable juror to infer knowledge of the weight of drugs possessed. Such an inference would be reasonable *only* if the prior experience involved activities of a type that would give rise to familiarity with weights of the drug possessed.[2] Even drawing all permissible inferences in favor of the prosecution, the evidence in this case does not permit a reasonable juror to find that Dixon had the type of experiences with heroin from which a reasonable inference could

arise that Dixon had knowledge of the weight of the drugs found in the car.

Regarding the prepackaged drugs found in the car, proof of possession—either constructive or actual—is insufficient to give rise to a reasonable inference that Dixon had sufficient contact with the drugs to experience their weight. The New York Court of Appeals has instructed that "[w]here the inference to be drawn is that of weight—as opposed to the bare fact that the substance possessed was an illegal drug—possession alone does not readily support the conclusion that the defendant was also aware that the drugs possessed were of a certain weight .... [T]here generally must be additional evidence from which knowledge of weight in particular can be inferred." *People v. Sanchez*, 86 N.Y.2d 27, 33, 652 N.E.2d 925, 928–29, 629 N.Y.S.2d 179, 182–83 (1995). The Court went on to say that there "*may* be instances where possession combined with other factors—such as the substantial quantity of drugs possessed or the manner in which they are packaged—supports the conclusion that the defendant was aware of the weight of the drugs possessed." *Id.* (emphasis added).

The majority holds that a reasonable juror could infer that Dixon had knowledge of the weight of the drugs found in the car. In my view, such an inference is not reasonable under the circumstances of this case, because there is no "additional

---

2. For example, even extensive evidence of prior, repeated, hand-to-hand sales of *ecstacy*, although clear evidence of "prior experience as a drug dealer," would not provide a factual basis for inferring that a defendant knew the weight of *heroin* he possessed. Similarly, evidence that a defendant repeatedly received mailed packages containing quantities of heroin (whether or not packaged for sale) that were hidden in items of clothing would unquestionably be evidence of prior experience as a drug dealer, yet that evidence alone would not provide a factual basis for inferring

that the defendant knew the weight of the heroin, as opposed to the total weight of the mailed packages, he possessed. Thus, it is not enough simply to say that there was evidence of Dixon's "prior experience as a drug dealer;" there must have been evidence of the nature of his activities as a drug dealer that would permit a reasonable inference that he knew the weight of the drugs found in the car. Usually such evidence consists of testimony that the defendant handled drugs. It is that evidence that is missing from the record in this case.

evidence" that Dixon had "sufficient contact with the substance to experience its weight—to give rise to a probability [he] became aware of the weight of the drugs in his possession." *Sanchez*, 86 N.Y.2d at 33, 629 N.Y.S.2d 179, 652 N.E.2d 925.

*Sufficiency of the Evidence*

The majority relies on three bases to show that Dixon had sufficient contact with heroin to experience its weight: (1) Dixon's prior experience as a drug dealer; (2) the prepackaging of the drugs found in the car; and (3) Dixon's links to that car. In my view, there was insufficient evidence in the record, whether considering these bases singly or together, to permit a juror to draw a reasonable inference that Dixon knew the weight of the drugs found in the car.

1. *Prior Experience As A Drug Dealer*

The record evidence that Dixon had "prior experience as a drug dealer" consisted entirely of police testimony that he was *suspected* of delivering drugs on a single occasion to one John Jones, who later sold them to an undercover officer inside a social club on November 30, 1977. An undercover officer ("Undercover Crawford") did make a drug purchase inside the social club on that date, but he purchased drugs from Jones, not from Dixon. Even the police witnesses never testified that Dixon sold drugs to the undercover officer. Importantly, there was no evidence whatsoever that Dixon handled any drugs,

packaged any drugs, negotiated any drug price, made any hand-to-hand drug sale, or received any cash in a drug transaction. In short, there was no evidence about Dixon's suspected activities that, if accepted by the jury, would have permitted the jury to infer from the nature of Dixon's involvement that he knew the weight of the drugs found in the car at a later date.

It is worth setting out the evidence on which the majority relies, which consists almost entirely[3] of the hearsay testimony of Officer McGeown, who was not present at the time of the supposed delivery by Dixon or the sale by Jones. McGeown testified as follows:

Q How about November 30th, who was involved in the sale that day according to you?

A John Jones and Larry Dixon.

Tr. at 607 (Mar. 29, 1982). McGeown's suspicion that Dixon was involved in a drug sale on November 30, 1977, led to his arrest and the later discovery of the drugs in the car.

Q What was [it that caused you to arrest Mr. Dixon]?

A He made a sale of narcotics on November 30th.

Q Where did that take place?

A Inside 185 Reid Avenue.

Q Were you present when that sale took place?

3. The majority also relies on: (1) the tape recording made of the transmission from the undercover officer's transmitter, discussed below; (2) a police buy report that is not part of the record available to this Court for review, but as to which nothing in the transcript of the trial suggests that it contains any additional information about the specific involvement of Dixon; and (3) a police laboratory report on which the police did not write Dixon's name, but did write code numbers indi-

cating that Dixon was a "subject," i.e., a suspect, in the purchase made from Jones in the social club.

The majority also cites, with apparent approval, the prosecutor's argument that other evidence that Dixon was a "professional drug dealer" included his use of a "driver's license listing an alias" and "a car registered in someone else's name," and Dixon's supposed *refusal* to sell drugs to the undercover officer. Maj. Op. at 85.

A I was not inside.

*Id.* at 604.

The source of McGeown's information was a radio transmission from Undercover Crawford. Undercover Crawford provided very little information to McGeown about Dixon over the radio. Indeed, the "buy" itself was not recorded on an audio tape, *id.* at 640, 674, because the transmission from the undercover officer provided only static interference while the undercover officer was in the club. *Id.* Even if the buy had been recorded, Dixon would not have been heard during the buy. No one ever claimed that Dixon sold anything to the undercover.[4] Instead, the prosecution argued that Dixon went into the social club's bathroom at the same time as Jones, and that Jones later sold drugs to the undercover. The undercover officer was not present when Dixon was in the bathroom,[5] and so could not have recorded any transaction involving Dixon. Moreover, Jones never told the undercover that Dixon had supplied him with drugs, so no such statement could have been on the tape. Thus, although the tape was played for the jury, they heard nothing meaningful other than the undercover's statements after leaving the social club.[6]

Neither Undercover Crawford nor any other witness present inside the social club testified at trial, and McGeown could neither hear nor see what happened inside the social club at 185 Reid Avenue. *Id.* at 674.

Q Everything that happened, tell us, from the moment you heard the undercover saying he was about to go someplace, do something; what was that?

A The undercover advised me he was in the area. As I stated, I was already aware that the van was in place to make observations.

\* \* \* \*

Q What happened next?

A The undercover entered the location. I believe I got a radio transmission to that effect, telling me he had entered the location and, from that point on, I could not hear the undercover any further. I got static on the Kel receiver.

Q Yes, go on. Tell us everything that happened.

A At a later time—

Q When do you mean "later," sir?

A About ten minutes later, I believe.

Q Okay.

A The undercover exited the location. I was informed of that by radio. I saw him again cross the intersection and a short while after he informed me by radio he was back in his car and he had made a buy from JD John, Little John and JD Larry.

---

4. Nor is there evidentiary support for the statement in the prosecutor's closing argument, relied upon by the majority as demonstrating that Dixon had prior experience as a drug dealer, Maj. Op. at 85, that Dixon *refused* to sell to the undercover officer.

5. Even the prosecutor admitted this much in closing argument. "That's why they went into the bathroom, so Crawford couldn't see anything." Maj. Op. at 85 (quoting Tr. 1614 (April 7, 1982)).

6. Again, the prosecutor in closing argument acknowledged that: "You must realize, of course, that this tape is made after the fact . . . . By after the fact, I mean it is not a conversation between the undercover police officer and John Jones or Littlejohn or Dixon, it is a conversation where [Undercover Crawford] is already out [of the social club], completed the sale and he is radioing the team." Maj. Op. at 84 (quoting Tr. 1589–90 (April 7, 1982)).

Q What does JD mean? Please tell the jury.

A John Doe. It's in lieu of giving what we consider a permanent identification because many of the people we deal with give us names which are not their own.

Q On this occasion, the undercover said to you and you heard it over the radio, that what had happened?

A That he had made a buy.

Q From?

A From Little John and, I believe, JD Larry.

Q What else, if anything, did you hear the undercover officer say?

A That's all I recall.

*Id.* at 640–41.

The police buy report, which was admitted into evidence, stated the undercover's suspicion that Dixon had supplied Jones with drugs. Nothing in the buy report could provide the factual predicate necessary to show Dixon's knowledge of the weight of drugs, however, because the undercover officer never observed Dixon package, handle, negotiate over, or sell any drugs. Thus, once again, the buy report is merely evidence of a police suspicion that Dixon delivered drugs on a single, unwitnessed occasion, but is not evidence of any specific activities of Dixon that would support an inference of Dixon's familiarity with drug weights.

An exhibit that included four glassine envelopes was also admitted into evidence. The majority treats as substantive evidence the fact that the police wrote on the evidence bag a code indicating that Dixon was a suspect in the transaction. The

writing on the evidence bag confirms, but does not expand upon, the police testimony that Dixon was thought to be involved in the sale by Jones. Importantly, evidence that the police suspected Dixon was "involved" in supplying drugs to a seller on November 30, 1977 does not supply the jury with proof of any fact from which they could permissibly infer that Dixon knew the weight of drugs discovered after his arrest on December 8, 1977.

Viewed in the light most favorable to the prosecution, the State proved, at most, that Dixon "re-upped" Jones by delivering some unknown quantity of heroin in a single, unwitnessed transfer in the social club bathroom. Even in connection with that possible delivery, however, there was no evidence whatsoever that would permit the jury to infer that Dixon had sufficient contact with the drugs to experience their weight. The jury cannot be permitted to speculate about whether or how those drugs were packaged, how they were transported, and whether or how Dixon ever handled them. "[I]t is not enough that the inferences in the government's favor are permissible;" inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir.1995).

### 2. *Prepackaging of the Drugs*

In the decisions applying New York law cited by the majority, the courts almost uniformly inferred a defendant's knowledge of the weight of drugs possessed only by relying on evidence that the defendant actually handled drugs.[7] *See, e.g., Cruz v.*

---

7. In *Sanchez,* the New York Court of Appeals noted that "handling" of drugs "is not limited to instances where the defendant manipulates the substance in the process of manufacture and packaging of drugs. It merely connotes sufficient contact with the substance to experience its weight—to give rise to a probability defendant became aware of the weight of the drugs in his possession." 86 N.Y.2d at 33, 629 N.Y.S.2d 179, 652 N.E.2d 925.

*Greiner,* 1999 WL 1043961 at *29 (S.D.N.Y.1999) ("The manner in which the drugs were packaged, in addition to Cruz's handling of the drugs," supports an inference of knowledge of the weight of the drugs possessed.); *People v. Diaz,* 228 A.D.2d 368, 368, 645 N.Y.S.2d 11 (1st Dep't.) ("the evidence that defendant actually handled the drugs at issue, ... along with the fact that the drugs were packaged in two separate bags ... was sufficient to support the inference"), *appeal denied,* 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996); *People v. Hardy,* 226 A.D.2d 652, 653, 641 N.Y.S.2d 366 (2d Dep't.) ("evidence that the defendant handled the controlled substance, together with other circumstantial evidence, may give rise to an inference that the defendant knew the weight of the controlled substance in his or her possession;" defendant was observed holding bag containing drugs) (citations omitted), *appeal denied,* 88 N.Y.2d 936, 670 N.E.2d 454, 647 N.Y.S.2d 170 (1996). New York courts have also held that mere possession of packaged drugs, without evidence of handling, is insufficient to infer knowledge of the weight of the drugs possessed, at least where, as here, the weight possessed is close to the statutory threshold. *People v. Pitterson,* 234 A.D.2d 79, 79, 650 N.Y.S.2d 225 (1st Dep't.1996) (possession in travel bag of three ounces of cocaine, packaged in 506 mini ziplock bags, "insufficient to establish that defendant was aware that he possessed at least two or more ounces" of cocaine). The total weight of the drugs found in the car Dixon was driving, two and five-eighths ounces, was even closer to the statutory threshold of two ounces than in the *Pitterson* case.

The New York Court of Appeals itself has expressly cautioned that presumptions of knowledge of the weight are particularly troublesome where, as here, the amount of drugs at issue is so close to the statutory requisite.[8]

> When one is charged with discerning minuscule variations in weight ... presumptions break down.... Presuming the defendant knew the weight of the drugs was just above—as opposed to just below—the statutory threshold is problematic. Possession alone could rarely be enough in such a close case."

*Sanchez,* 86 N.Y.2d at 33–34, 629 N.Y.S.2d 179, 652 N.E.2d 925. *See also People v. Sanchez,* 86 N.Y.2d 27, 34, 652 N.E.2d 925, 629 N.Y.S.2d 179 (1995) (police recovered a plastic bag containing 3 1/4 ounces and 3 grains of cocaine from the defendant's car, yet Court of Appeals held that "possession alone [was] not enough to establish weight because the amount possessed was so close to the statutory limit of two ounces, and no other circumstances indicated familiarity with drugs that might lead to knowledge of the weight.").

The majority's holding, that possession of an amount of prepackaged heroin close to the statutory threshold—without evidence of handling of the drugs by the defendant—gives rise to a reasonable inference of knowledge of the weight possessed, is inconsistent with the New York decisions cited above, including *Sanchez* itself. In my view, absent evidence that Dixon ever handled drugs, an inference that Dixon knew the weight of drugs merely because they were prepackaged is not reasonable.

### 3. *Evidence Linking Dixon to the Drugs*

The majority's efforts to link Dixon to the car in which the drugs were found,

---

**8.** The majority acknowledges this proposition of New York law, Maj. Op. at 82, but never seems to apply it to the facts of this case.

although successful from an evidentiary standpoint, do not cure the problems of proof at trial. To the extent that Dixon's possession of the drugs was a matter of statutory presumption and thus merely constructive, the failure of proof is complete. Constructive possession alone provides no evidence that Dixon had any actual knowledge that the drugs existed, much less that he had sufficient contact with the drugs "from which knowledge of the weight in particular can be inferred." *Sanchez*, 86 N.Y.2d at 33, 629 N.Y.S.2d 179, 652 N.E.2d 925. Dixon's link to the car is intended to show his link to the drugs, but evidence of his use or even ownership of the car provides no evidence of the handling of the drugs found in the car.

Even assuming that a "link" between Dixon and the car could be found from the fact that Dixon drove the car three times and picked it up from the police, that evidence at most proves possession of the drugs; it does not constitute "additional evidence from which knowledge of weight in particular can be inferred." *Sanchez*, 86 N.Y.2d at 33, 629 N.Y.S.2d 179, 652 N.E.2d 925. There is no evidence in the record to prove anything beyond mere possession, and neither the District Court nor the State pointed to any when requested to do so on remand. Neither a jury nor this Court, therefore, should speculate whether or not Dixon had "sufficient contact" with the drugs in the car "to give rise to a probability [that Dixon] became aware of the weight of the drugs in his possession." *Id.* In the absence of evidence beyond mere possession of drugs, even drugs prepackaged for sale, there simply is no permissible basis for an inference regarding Dixon's knowledge of the weight of the drugs, especially because the weight of the drugs found was so close to the statutory requirement of two ounces.

*Conclusion*

In *People v. Ryan,* 82 N.Y.2d 497, 605 N.Y.S.2d 235, 626 N.E.2d 51 (1993), the New York Court of Appeals cautioned that "we cannot simply read the knowledge requirement out of the statute....," 82 N.Y.2d at 505, 605 N.Y.S.2d 235, 626 N.E.2d 51; *see also Sanchez,* 86 N.Y.2d at 34, 629 N.Y.S.2d 179, 652 N.E.2d 925 ("[T]here may be instances where it is indeed difficult to show defendant's knowledge of the weight, but we cannot simply read the knowledge requirement out of the statute."). I respectfully believe that the majority does precisely that by holding that Dixon's knowledge of the weight of the drugs he constructively possessed could have been inferred, despite the absence of evidence of his familiarity with or handling of drugs sufficient to permit such an inference.

Because I cannot find in the record any evidence to support a reasonable inference that Dixon knew the weight of the drugs he possessed, I must conclude that the State failed to carry its burden of proof of an essential element of the crime for which Dixon was convicted. Accordingly, I would grant the petition and must respectfully dissent from the majority's decision to affirm.